UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                     CASE NO. 3:23-cr-47-WWB-LLL

JAMES DARRELL HICKOX

## UNITED STATES' SENTENCING MEMORANDUM AND MEMORANDUM OF LAW

The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, files this sentencing memorandum and memorandum of law in anticipation of the sentencing hearing currently scheduled for January 27, 2025.

### I.      Use of Summary Exhibit

The United States expects to introduce extensive writings and records in evidence during the upcoming sentencing hearing. For example, evidence supporting the conclusion that defendant Hickox intended to traffic in six kilograms of fentanyl in connection with the staged traffic stop that is the subject of a pending defense objection has been compiled from text logs and image files taken from a complete cellular phone extraction over the course of approximately one month, subpoenaed phone records for two cellular phones including times and elapsed times of calls, the contents of a search warrant return for a cloud storage account under the control and ownership of defendant Hickox, and screenshots of text exchanges from a third cellular phone. The United States submits that, due to the voluminous

nature of these records, they cannot be readily presented in evidence at the sentencing hearing and readily comprehended entirely on their own.

Fed. R. Evid. § 1006 permits a proponent of evidence to "use a summary, chart, or calculation to prove the content of voluminous writings, records, or photographs that cannot be conveniently examined in court." The Rule further requires that the proponent must make the original or duplicates available for examination or copying by the other parties and provides that the Court may order the proponent to produce them.

In this sentencing hearing, the United States plans to admit the voluminous writings and records to be summarized into evidence as a single substantive exhibit, and to use the summary exhibit as an aid to comprehension, to facilitate the efficient and swift presentation of evidence, and to minimize excessive and unnecessary use of Court and counsel's time. The items of evidence intended to be summarized are text messages and records of phone calls placed between a total of four mobile devices as well as image files transmitted between these mobile devices. *See United States v. Aubrey*, 800 F.3d 1115 at 1130 (9th Cir. 2015) (holding that Fed. R. Evid. § 1006 was satisfied where a government auditor summarized multiple boxes of bank records which were previously made available in discovery.)

Investigative reports (specifically FBI-302 reports) describing the contents of the evidence to be summarized have been sent to the defendant in discovery, with the earliest relevant disclosure being made when discovery was provided shortly after the indictment was superseded, with the disclosure going out on September 25, 2023.

2

While the complete device extraction contents were not themselves sent on this date, defense counsel was made aware of the devices in the United States' custody and was provided with an invitation to view the original documents at an FBI or U.S. Attorney's Office facility at defense counsel's convenience. Id.

II.   **Potential Admissibility of Proffered Statements**

After his arrest and detention, defendant Hickox signed proffer agreements with the United States and participated in several interviews with law enforcement subject to the terms and conditions of the proffer agreements. The proffer agreements, which are identical in their content save for the dates and times of the proffers themselves, contain the following relevant provisions:

"(3)   In the course of the prosecution against [defendant], the government will not offer in evidence during its case-in-chief, or in aggravation of [defendant]'s sentence (in accordance with USSG §1B1.8), any statements made and/or information provided by [defendant] at the proffer, except as noted below."

"(5)   In the event [defendant] offers testimony in any legal proceedings, or otherwise presents a position, which is materially different from, or contrary to, statements made, and/or information provided during the proffer, the government may use the statements made and/or information provided during cross-examination of [defendant], and to otherwise impeach, rebut, and contradict that testimony or position."

During the most recent of these proffers, Hickox made statements describing matters which are the subject of pending objections, specifically, whether the

3

defendant should be assessed additional drug weight for fentanyl in connection with a plan to seize a shipment of suspected narcotics using a fabricated traffic stop. *See* Doc. 118 at Para. 40.

The terms of the relevant proffer agreements prohibit the defendant from testifying contrary to his proffered statements without waiving the protections of Paragraph 3 as detailed above. The terms also prohibit the defendant, either personally or through his trial counsel, from presenting a position materially different from his proffered statements without similarly waiving his Paragraph 3 protections.

In the event that such a position is argued or adopted, the proffer agreement will be violated and the protections of Paragraph 3 waived, and the United States should be permitted to introduce the proffered statements in evidence through the testimony of law enforcement officers who participated in the proffer. Should the Court find that these conditions have been met, the United States intends to call as a witness IRS Special Agent Christopher Schneider to testify about the substance of the defendant's proffered statements and may introduce into evidence an audio recording of the defendant's statement if available.

Similarly worded proffer agreements have been held to prohibit defense counsel from taking factual positions contrary to their client's proffered statements at trial without waiving proffer protections. *See United States v. Tomlinson*, 647 Fed.Appx. 892, 896-897 (11th Cir. 2017) (Defendant's proffered statements admissible in evidence in government's case-in-chief, where defense attorney's opening statement at trial contradicted her client's proffered statements, and proffer

4

agreement provided that defendant waived proffer protections if the defendant "subsequently takes a position in any legal proceeding that is inconsistent with the proffer").

### III. Pending Objection Regarding Drug Weight

Defendant Hickox pled guilty to counts three, eight, and eleven of the superseding indictment on May 15, 2024. Doc. 85. During the change of plea hearing, defendant Hickox confirmed that he admitted to the factual basis described in the plea agreement but reserved the right to object to being assessed additional points under the Sentencing Guidelines for the criminal conduct described on pages 41-42 of the plea agreement under the caption "Attempted Seizure and Diversion of Fentanyl." Doc. 87 at 41-42. Defendant Hickox maintained that both he and the individual described as Subject-1 knew that the substance was not fentanyl for weeks before the staged traffic stop, and that as a result, he should not be assessed additional offense levels for drug weight. The United States maintains that the evidence shows that Hickox believed that the substance was or was substantially likely to contain a detectable amount of fentanyl at the time the staged traffic stop took place and acted in accordance with that state of mind.

Defendant Hickox regularly worked with a drug trafficker (referred to in the Plea Agreement and the Presentence Report as Subject-1) to distribute narcotics on his behalf and remit part of the profits to him. While the two worked together to accomplish these goals, Hickox learned from Subject-1 that six kilograms of fentanyl had recently arrived in his possession from an out-of-state narcotics source. Subject-

5

1 worked with Hickox and co-defendant Earrey to stage a traffic stop so that Subject-1 would be able to convince their out-of-state source that the fentanyl had been seized by law enforcement and Subject-1 would be unable to repay the source for it.

The stop took place on September 9, 2022, and is referenced repeatedly in text communications between Hickox, Earrey, and Subject-1 between September 7, 2022, and September 28, 2022.

On September 9, 2022, at approximately 2:36pm, Earrey sent text messages to another member of the Florida Highway Patrol, known by the initials S.M. S.M. was not aware of the illicit nature of the staged traffic stop and believed that he was participating in a genuine law enforcement operation. Earrey asked S.M., "Hey bud. It's Josh Earrey. Would you be able to assist me and my partner from DEA at avenues mall. We just need a marked unit. You don't have to stop a car or anything. It would be around 430 [pm]." S.M. responded, "Sure." Earrey responded, "Ok. I'll call you when it gets closer and tell you where to meet us" and then elaborated "Meet us in front of jc penny at avenues mall at 4[pm]". Earrey then texted Hickox "I have a trooper", to which Hickox responded "Ok it will make it look better". The entire text exchange described above took place between 2:36pm and 2:38pm.

Between 3:55pm and 4:37pm, Earrey and Hickox exchanged text messages between each other, asking where they are and how close they are to the meet location. After these exchanges, there are a series of short, rapid phone calls between Hickox and Subject-1. These six phone calls take place between 4:53pm and 5:13pm and range in duration from four seconds to fifty-six seconds.

6

At 5:15pm, the staged photo of Earrey and S.M. taken from the backseat of S.M.'s patrol vehicle was taken. This photo was recovered from an electronic search warrant return from Hickox's cloud storage account, and the creation time of the image file was confirmed by its metadata. At 5:17pm, there was a phone conversation approximately five minutes long between Subject-1 and Hickox, with an additional three short phone calls between Earrey and Hickox from 5:19pm through 5:51pm. After the last of these calls, Hickox texted Subject-1 at 5:56pm, stating "Start acting like your guy is popped [arrested]". Between 6:10pm and 6:15pm, Hickox sent Subject-1 a series of four images.

Later that night, at approximately 11:20pm, Hickox's phone was used to take a photograph of a forged DEA report describing the fictional circumstances of the staged traffic stop, with fake names of agents. The report describes the seizure of seven kilograms of substance that field tested positive for fentanyl, rather than six. Approximately one hour later, Hickox sent an image (believed to be this image) from his phone to Subject-1.

The following morning, at approximately 8:13am, Hickox texted Earrey an image of the same report, together with the following description: "Completely fake. If someone from FHP dings [finds] out and says something to you. Tell them I did it and pick a bone with me." Earrey responded "Awesome. Make sure how many packages so the count is right." Hickox replied "I did. All good" and "I have a plan. Call me later and fill you in." Approximately 15 minutes later, Hickox and Earrey had a phone call about nine minutes in duration.

Shortly afterward, at approximately 9:10am, Hickox texted Subject-1, "Let me know if that [the fake report] is good.  I am out and about".  Subject-1 replied, "I'm going to read now."  Approximately five minutes later, Subject-1 texted Hickox, "Yes this will definitely work. So far so good on my end."  Hickox replied, "Ok. Fingers crossed."

Two days later, there are numerous phone calls exchanged between Hickox, Earrey, and Subject-1 between 8:51am and 11:42am.  At 1:22pm that same day, Earrey texted Hickox a photograph of a TruNarc test, which displayed the name 'Benzocaine'[1] rather than the expected fentanyl.  Together with the photograph, Earrey sent the following message: "Tested it all over. Several spots. And this is all I get."  Hickox responded: "Gotta go old school with a field test."  Earrey responded that Hickox needed to call Subject-1.  Later in this text exchange, Earrey told Hickox that he (Earrey) was no longer equipped to administer "wet tests" to narcotics because FHP required the use of TruNarc instead.  Hickox responded, "Ok I have some. There [sic] in my Tahoe. I can get it later and we can test. **I highly doubt it's fake.** I had several like that before and had to use the old method." [emphasis supplied].

At 3:29pm, Earrey texted Hickox an image of another drug test, which

---

[1] Benzocaine is a mild topical anesthetic, typically administered in spray form directly to the site of minor injuries, insect bites, or certain dental procedures.  It is widely available over-the-counter and is rarely abused recreationally.  However, due to it's mild analgesic effects, low cost, and the ease with which it can be acquired legally, it is commonly used to "cut" or dilute more powerful controlled substances such as heroin and cocaine.

displays "4-chloromethcathinone", accompanied by text from Earrey stating simply "Cathinone".[2]

After receiving these test results, Hickox and Subject-1 placed a flurry of phone calls to one another, with seven phone calls taking place from 3:46pm to 7:16pm. Two days later, on September 14, Earrey texted Hickox, "Heading to meet R." Earrey responded, "T/4 [10-4, or "affirmative"]".

Six days after that exchange, Hickox and Earrey texted at approximately 9:45am about meeting "around noon." At 12:33pm, Earrey texted Hickox, "I'm here". Approximately thirty minutes later, Earrey texted Hickox, "All black. No orange in the test."[3]

Two days later, on September 22, Earrey texted Hickox, "R hasn't got rid of anything yet. Says he's having someone try it tonight." Hickox replied, "Hit me up when you can." Five days after that exchange, on September 27, Earrey texted Hickox, "Going by to see R today when I get back in town. Call you when I get to him." The following day, Earrey texted Hickox, "R hasn't got rid of anything. Had someone test the other and nothing. I think we are screwed. **Just wait and switch stuff out.**" Earrey continued the text exchange with Hickox, adding, "Says he's

---

[2] Cathinones are controlled substances related to amphetamines, such as methamphetamine. They are not widely trafficked or abused in the United States on their own but are commonly abused recreationally in other countries by chewing leaves containing the chemical, which are known as "khat." Synthetic cathinones are the most common ingredients of the family of narcotics which are marketed as "bath salts" or "potpourri".

[3] The chemical reaction-based "wet tests" described in earlier text exchanges for fentanyl normally produce an orange color if they detect the presence of fentanyl in the substance being tested.

9

going to **get something he knows for sure is good and put on it. And then get after it.**[4] [emphasis supplied] Hickox responded, "Ok." Earrey then texted Hickox, "I know he's not screwing us bc [because] he can't sell cut. Lol." Hickox replied, "Oh I know and he knows what would happen."

On March 10, 2023, federal agents searched Hickox's house and recovered (in addition to the narcotics and stolen firearms described in the plea agreement) a duffel bag in the attic containing three one-kilogram bricks which tested positive only for benzocaine. As defense counsel appears to concede in his objection to the enhancement for trafficking in fentanyl, these three kilograms are from the exchange relating to the staged vehicle stop. *See* Doc. 118 at 34 ("Hickox never attempted to sell the substance, which when later seized by law enforcement was found to be benzocaine.")

Based on the available evidence, Hickox intended to traffic in fentanyl when he staged the fake traffic stop and took custody of the associated kilograms of narcotics. Hickox and Earrey exchanged numerous private text messages between one another over a period of several days, sharing their frustration and disbelief that the substances believed to be fentanyl were only testing positive for benzocaine or cathinone. Hickox explicitly told Earrey during the testing that he "highly doubted it's fake." If both Hickox and Earrey believed the narcotics to be fake at the outset,

---

[4] Based on the training and experience of case agents, this exchange is a reference to getting genuine narcotics (something he knows for sure is good) and using the inert narcotics from the staged traffic stop to "cut" them (or put on it), then sell the result (or "get after it.")

10

as Hickox claims, this text exchange would have never taken place. There was no need to express disbelief at negative test results for narcotics which are known to be fake (or indeed, to test them at all); there was no need to repeat the testing in a different format to confirm that the narcotics are fake; there was no need for Hickox to call Subject-1 to let him know that the narcotics were fake if both parties already knew that information, as Hickox claims. Furthermore, the conspirators would not have texted one another in disbelief ("I think we're screwed") about the negative test results if they had expected the narcotics to be fake.

Likewise, if the purpose of the staged traffic stop was to allow Subject-1 to escape payment for a shipment of fake drugs and preserve his relationship with his source of supply, Hickox would not have written the fake report to indicate that the seized narcotics yielded positive results for fentanyl, nor would Subject-1 have told Hickox that the fake report "would definitely work" after reading it. If the source of supply had attempted to cheat Subject-1 by knowingly shipping him fake narcotics, he would have realized the stop was staged upon reading the report, because he would have expected the seized narcotics to test negative for fentanyl.

If Subject-1 and Hickox had intended to preserve Subject-1's relationship with the source of supply, Hickox's forged report would have severely disrupted or destroyed this relationship, because the report suggests that at least one of Subject-1's associates was having their communications actively intercepted by a federal Title III wiretap operation. No illicit narcotics supplier would ever knowingly work with a distributor whose communications were actively being intercepted and whose drug

11

shipments were being seized as a direct result. Because the report was entirely fake, it could have been written in a way that would have convinced the source of supply that the drugs were seized only by bad luck (such as the courier getting in an automobile accident or being pulled over for driving on a suspended license) and that continuing to work with Subject-1 was reasonably safe, but it was not.

If the intention of the staged vehicle stop was to provide cover for Subject-1 and allow him to avoid paying for fake narcotics, Hickox and Earrey would not have only begun discussing backup plans for how to distribute the narcotics until after they confirmed them to be fake by multiple rounds of testing.

Even if Hickox's version of events were credible, it is clear that Hickox and Earrey intended to traffic in fentanyl using the inert narcotics. As discussed in the text exchanges, once the narcotics were confirmed fake, Earrey immediately proposed waiting to "swap it out", to which Hickox agreed. This is a clear reference to the common practice of the conspirators to switch inert or fake kilograms of narcotics with those of genuine narcotics held in evidence and then turn over the diverted genuine narcotics to drug dealers to sell on their behalf, as described in the defendant's plea agreement. *See* Doc. 87 at 38-39. This is corroborated by the recovery of fake 3D-printed objects resembling kilograms of narcotics recovered from Hickox's residence during the search, which confirmed that Hickox was continuing to engage in this conduct. The recovery of three of the benzocaine kilograms from Hickox's attic strongly suggests that he still intended to carry out this plan and may have been partially successful already.

Additionally, Hickox has admitted to previously distributing fentanyl on multiple occasions, which means that his intent to divert and distribute fentanyl from the staged vehicle stop can be inferred from its consistency with his well-established criminal practices. For example, Hickox used a former confidential informant of his to sell fentanyl and heroin that Hickox had stolen and diverted from law enforcement seizures, conducting these clandestine sales on approximately 20-30 occasions, and securing approximately $40,000 in profits for himself. Doc. 118 at Para. 37-38. Hickox even possessed approximately 263 grams of fentanyl in his own home, suggesting that his fentanyl trafficking activities and intentions continued up to the day of his arrest.

## IV. Conclusion

Based on the evidence described above, which the United States intends to present to the Court at the sentencing hearing on January 27, 2025, undersigned counsel requests that the Court overrule the defendant's objection to the additional Sentencing Guidelines offense levels reflecting the six kilograms of fentanyl that defendant Hickox knowingly attempted to traffic.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: /s/ *William S. Hamilton*
William S. Hamilton
Assistant United States Attorney
Florida Bar No. 95045
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone: (352) 547-3600
Facsimile: (352) 547-3623
E-mail: william.s.hamilton@usdoj.gov

U.S. v. James Darrell Hickox          Case No. 3:23-cr-47-WWB-LLL

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Daniel A. Smith, Esq.
    Warren Lindsay, Esq.
    Bryan DeMaggio, Esq.

                                    /s/ *William S. Hamilton*
                                    William S. Hamilton
                                    Assistant United States Attorney
                                    Florida Bar No. 95045
                                    35 SE 1st Avenue, Suite 300
                                    Ocala, Florida 34471
                                    Telephone:  (352) 547-3600
                                    Facsimile:   (352) 547-3623
                                    E-mail: william.s.hamilton@usdoj.gov